**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) |
| | ECF Case |
| This document relates to: | 15-cv-9903 (GBD)(SN) |
| *Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran, et al.* | ECF Case |

<u>**MEMORANDUM OF LAW FOR ENTRY OF PARTIAL FINAL DEFAULT JUDGMENTS ON BEHALF OF *BURNETT/IRAN* PERSONAL-INJURY PLAINTIFFS**</u>

**(*BURNETT / IRAN* PERSONAL INJURY 8)**

For the reasons set forth below and in the accompanying declaration of John M. Eubanks ("Eubanks Declaration"), the Plaintiffs identified in Exhibit A to the Eubanks Declaration filed contemporaneously with this application, by and through their counsel, Motley Rice LLC, respectfully move this Court for an Order awarding them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; (3) leave for the *Burnett*/*Iran* Personal-Injury Plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for any other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Plaintiffs sued The Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, "the Iran Defendants") in connection with the 9/11 Attacks. On December 1, 2016, all Plaintiffs in the action *Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran*, et al., Case No. 15-cv-9903 (GBD)(SN) ("*Burnett/Iran*"),

moved for judgment as to liability only.  15-cv-9903 ECF Nos. 65, 66, amended on December 6, 2016, 15-cv-9903 ECF Nos. 68, 69.  On January 31, 2017, the Court granted Plaintiffs' application for judgment as to liability only. 15-cv-9903 ECF No. 85.  The Plaintiffs that are party to this application, as identified in Exhibit A, are a subset of the Plaintiffs who have been granted judgment as to liability only, and rely on that judgment as to liability for their request for damages arising from the personal injuries they sustained in the Terrorist Attacks on September 11, 2001. The Plaintiffs identified in Exhibit A now request entry of partial final default judgment against the Iran Defendants as to their claims.

## I.    Procedural Background

### A.    Related Cases

Relying on evidence and arguments[1] submitted by Plaintiffs in *In re Terrorist Attacks on September 11, 2001*, the consolidated multidistrict litigation arising out of the 9/11 Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of the *Havlish, Ashton, O'Neill, Federal Insurance*, and *Hoglan* groups of plaintiffs against the Iran Defendants (*See* ECF Nos. 2516, 3014, 3016, 3020, 3020-23). After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* Plaintiffs and their decedents. Upon the submissions of the *Havlish* Plaintiffs, on October 3, 2012, this Court found that "Plaintiffs may recover for [, inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4).  In such an action, . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover

---

[1] In each of the Orders of Judgment regarding Plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

In that same decision in *Havlish,* this Court also found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5.  The Court has also applied that 3.44 multiplier to judgments in the *Ashton* case.  *See* ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier).  The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett/Iran*.  ECF No. 3666.  However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the Plaintiffs' request for punitive damages be denied without prejudice.  ECF Nos. 3358 at 11-16 and 3363 at 28.  Judge Daniels adopted Judge Netburn's Reports and Recommendations in their entirety. ECF Nos. 3383 at 2 and 3384 at 6.

### B.   *Burnett, et al. v. Iran* Defendants

The *Burnett/Iran* Plaintiffs filed suit on December 18, 2015, against the Iran Defendants. Service on the Central Bank was effectuated on March 18, 2016, and on Iran and the IRGC on September 14, 2016. 15-cv-9903, ECF No. 67 at ¶¶ 3-4.  At Plaintiffs' request, the Clerk of the Court issued a Certificate of Default as to the Iran Defendants on December 5, 2016. 15-cv-9903, ECF No. 67.  On December 1, 2016, Plaintiffs requested judgment as to liability against the Iran Defendants, (15-cv-9903 ECF Nos. 65, 66), whose application was amended on December 6, 2016 (15-cv-9903, ECF Nos. 68, 69), after the Clerk of the Court issued a Certificate of Default on December 5, 2016. ECF No. 67.  The Court granted judgment as to liability against the Iran Defendants in favor of all plaintiffs on January 31, 2017.  15-cv-9903, ECF No. 85.

The *Burnett/Iran* Plaintiffs identified in Exhibit A now respectfully request that this Court grant them an Order awarding them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; (3) leave for the *Burnett*/*Iran* Personal-Injury Plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

## II.    Damages Under § 1605A

Section 1605A of the Foreign Sovereign Immunities Act (FSIA) creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," 28 U.S.C. § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).

### A.      Personal-Injury Damages

The Plaintiffs identified in Exhibit A include individuals who were on site at the time of the terrorist attacks in New York, New York (at the World Trade Center complex or surrounding area); or who were among those who entered the premises in the vicinity of the World Trade Center and were injured on September 11, 2001. The injuries of individuals who were injured on September 11, 2001 range from smoke inhalation and broken bones to devastating burns and loss of limbs. One injury that accompanies the vast majority of these physical injuries is the onset of post-traumatic stress disorder for most of the individuals who were caught in the horror of the attacks on September 11, 2001. Under the FSIA, these injuries are all compensable, and given that these injuries occurred either as a direct result of the attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of attempting to assist or render aid to the injured or endangered or to flee from the scene, the proximate causation of these injuries is not in question.

This Court has previously examined personal-injury damages in the context of the terrorist attacks on September 11, 2001. In the first Report and Recommendation issued by Magistrate Judge Netburn addressing personal-injury damages in this context (which was affirmed by Judge Daniels without objection), the Court found that an upward departure from prior D.C. Circuit precedent was appropriate where "personal injury plaintiffs cannot escape the memory of 9/11." *See* ECF No. 5879 at 5. This accorded with Magistrate Judge Maas' determination in 2012 that the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day" and "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS

110673, at *105 (S.D.N.Y. July 30, 2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)).

This Court then established "a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million for personal-injury damages for pain and suffering arising from injuries sustained on September 11, 2001. The Court, however, reserved its discretion to award further upward departures in exceptional cases." *Id.* at 6. The Court divided the categories of injuries into three classifications:

1.  "Significant" injuries (presumptively $5 million for pain and suffering): "single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in dust or debris; significant respiratory ailments including nasal irritations, chest pain, and asthmas from inhalation of smoke, soot and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery. This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries." *Id.* at 6-7.

2.  "Severe" injuries (presumptively $7 million for pain and suffering): "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas." *Id.* at 7.

3.  "Devastating" injuries (presumptively $10 million for pain and suffering): "loss of limbs or multiple digits; severe pulmonary traumas; strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic trauma. Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category." *Id.* at 8.

The Court issued upward or downward departures based on the facts of each case presented. For example, in the case of Plaintiff Lauren Manning, this Court granted an upward

departure and found that Manning was entitled to a $25,000,000 judgment, noting that Manning's injuries were "beyond devastating."  *See* ECF No. 5955 at 3-4.

    **B.**    **Punitive Damages**

    Under the FSIA, Plaintiffs are also entitled to punitive damages. *See* 28 U.S.C. §1605A(c)(4). In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." (ECF No. ECF 2619, at 13, citing *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory) (ECF No. 2623). The Court has applied that ratio to awards for plaintiffs in other related cases. *See, e.g*., ECF No. 3175, at 3 (Magistrate Judge Maas Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229, at 1 (Judge Daniels adopting in its entirety Judge Maas' Report and Recommendation to apply 3.44 multiplier); ECF No. 3300, at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

    However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the Plaintiffs' request for punitive damages be denied without prejudice. ECF No. 3363, at 28. Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the Plaintiffs' request for punitive damages.  ECF No. 3384, at 6.

    In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request leave to address the issue of punitive damages at a later date. *See, e.g*., ECF No. 3666 (Judge Daniels order in *Burnett/Iran*,

authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### C.     Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). This Court awarded the *Havlish* Plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment (ECF 2619 at 13-14). This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* Plaintiffs' expert.

After the *Havlish* award, Plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states. *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA"). *World Trade Farmers Market, Inc. v. American Airlines, Inc.* (*In Re: September 11th Litigation*), 2015 U.S. App. LEXIS 16619, *66 (2d Cir. Sept. 17, 2015). In that case, the Second Circuit concluded that a federal cause of

action under the ATSSSA must look to state rules concerning prejudgment interest. *Id*. Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the Plaintiffs' 9/11 claims. *Id*.

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. ECF No. 3384 at 6.

In light of the Court's decision in the *Hoglan* matter, applying the 4.96 percent rate to prejudgment interest, the *Burnett/Iran* Plaintiffs identified in Exhibit A respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## III.    Individualized Case Assessments

While Plaintiffs' motion addresses 12 personal injury claims that cross multiple categories, all of these Plaintiffs were injured at or within close proximity to the World Trade Center.  What follows is a summary of the attached proofs.[2]

### A.    Scott Roy Beloten
Injury Category[3]: Building Collapse/Falling Debris Injuries
Severity:  Severe

On September 11, 2001, Scott Roy Beloten worked as a paramedic in the ambulance department at Maimonides Medical Center. *See* Eubanks Dec., Ex. B, Declaration of Scott Roy

---

[2] These are arranged alphabetically.
[3] The categories cited are those categories set forth in the January 10, 2020 letter submitted by the Plaintiffs' Executive Committee for Personal Injury and Death Claims. *See* ECF No. 5484 at 13-14.  Those categories include the following:
1)      IMPACT INJURY

Beloten at ¶ 3. On the morning of September 11, 2001, Mr. Beloten was on duty as a paramedic at Maimonides Medical Center when his unit was called to respond to the World Trade Center ("WTC") area shortly after the second passenger jet plunged into the South Tower. *Id*. at ¶ 4. When he arrived at the WTC area, Mr. Beloten witnessed horrific scenes of people jumping from both towers and plunging to their deaths. Some of these victims landed within close proximity to his position. *Id*. at ¶ 5.

Just before entering the Marriott building at the WTC to render aid to the injured, Mr. Beloten looked up to avoid jumpers from the South Tower and saw a piece of sheet metal debris falling towards him. Mr. Beloten put his arms up to shield his body from the falling metal debris, but the sheet metal debris slammed into his body. He received injuries to his neck and left forearm from the falling debris, as well as multiple lacerations to his hands and fingers. *Id*. at ¶ 6. Despite his injuries, Mr. Beloten entered the Marriott building, and he became buried under the falling debris when the South Tower collapsed onto the Marriott. He further injured both of his hands, arms, and his left knee while running from a massive debris cloud that rained down upon him. Mr. Beloten further slammed his left knee into a marble planter while trying to cover his body from

---

Persons physically injured by the impact of the aircraft hitting the WTC I, WTC II, Pentagon, and WTC Marriot (jet fuel burns or blast injuries, jet fuel exposure and damage, broken backs/necks/limbs, paraplegics, orthopedic trauma);

2)        ESCAPE INJURY

Persons physically injured during the escape from the buildings (those injured descending the long dark staircases, those injured in elevators (i.e. during free falls), those who were trampled while escaping, those who fell and were injured while the Pentagon or WTC were under attack, resulting in broken bones, crushed limbs, trauma lacerations, bruising, etc.);

3)        BUILDING COLLAPSE INJURY

Persons physically injured in either the WTC I or II buildings or Marriot WTC collapse at and around Ground Zero (explosion-like injuries, being buried in rubble, eye or ear damage, head injuries, crushed limbs, multi-system acute traumas, shrapnel like injuries from glass or metal, etc.);

4)        FALLING DEBRIS INJURY

Persons injured at Ground Zero or Pentagon by falling debris (TBIs, concussions, crushed limbs, variety of physical injuries and traumas);

5)        PULMONARY TRAUMA INJURY

Persons who breathed in large quantities of smoke, debris, chemicals, WTC Dust, jet fuel or related toxins at Ground Zero, Pentagon, or Shanksville, PA and whose lungs were burned, damaged and injured on 9/11; and

6)        LATENT INJURIES (CANCERS)

These cases are not contemplated at this time.

still more flying debris. He also became engulfed in a thick cloud of smoke and building debris, and he inhaled massive quantities of these substances into his lungs and airways. *Id*. at ¶¶ 7-8.

After he evacuated from the Marriott, the North Tower collapsed near his position and Mr. Beloten became engulfed in another massive debris cloud. Despite his own injuries and the chaos around him, Mr. Beloten continued to perform his duties by helping injured people move to a triage area near Ground Zero for several hours after the collapse of the South and North Towers. *Id*. at ¶ 10. As a result of these terrorist attacks, Mr. Beloten suffered multiple injuries, including injuries to his hands and wrists, both knees, as well as a chronic cough, reactive airway dysfunction syndrome, asthma, bronchitis, rhino sinusitis, gastroesophageal reflux disease (GERD), dyspnea, and post-traumatic stress disorder (PTSD). *Id*. at ¶ 12.

     **B.**     **Maria E. Castillo**
            **Injury Category:  Escape/Building Collapse Injuries**
            **Severity: Significant**

On September 11, 2001, Maria E. Castillo worked as a security guard with Summit Security Services, Inc., at the WTC property. *See* Eubanks Dec., Ex. C, Declaration of Maria E. Castillo at ¶ 3. Mrs. Castillo had been providing security services near 4 WTC when the first passenger jet, American Airlines Flight 11, struck the upper section of the North Tower. She felt the building tremble and she ran upstairs to inspect the area. She saw building debris on the concrete floor and large amounts of debris falling out of the sky. Mrs. Castillo began to direct the fleeing crowd of people in a safe direction away from the debris area, but a mass of people escaping from the area ignored her instructions and trampled over her. She suffered injuries to her back, neck, and right knee during this course of events. *Id*. at ¶¶ 4-5. One of Mrs. Castillo's coworkers came to her aid and helped her to stand up, and she then left the area near 4 WTC as well.  *Id*. at ¶ 6. Despite her injuries, she fled the building and went to the South Tower to get her bag. Mrs. Castillo helped to

evacuate hundreds of people through the revolving doors of the South Tower, and then she ran towards 5 WTC in an effort to help others evacuate the area. *Id*. at ¶¶ 7-8.

The second passenger jet, United Airlines Flight 175, then struck the upper section of the South Tower as Mrs. Castillo assisted her supervisor in evacuating more people. She ran away from the WTC area, but the South Tower collapsed and she became engulfed by the massive cloud of smoke and building debris. *Id*. at ¶ 9. In the darkness of the debris cloud, Mrs. Castillo fell to the ground a second time and people trampled over her as they fled the area. She suffered additional injuries to her back, but she crawled through the smoke and debris until she saw daylight and escaped from the area. As a result of these terrorist attacks, Mrs. Castillo suffered multiple injuries, including injuries to her back (including a herniated disc and bulging discs), her neck, her right knee, and PTSD.  *Id*. at ¶¶ 10-11.

> ### C.     Anthony Ciarnella
> #### Injury Category: Escape/Building Collapse Injuries
> #### Severity: Severe

On September 11, 2001, Anthony Ciarnella worked as a Vice President and Manager of Customer Service with Bank of America on the 10th Floor of the North Tower. *See* Eubanks Dec., Ex. D, Declaration of Anthony Ciarnella at ¶ 3. When the 9/11 terrorist attacks occurred, Mr. Ciarnella had been working in his office. He and others fled to an exit stairwell to escape from the building. The stairwell began to fill with water as the building's sprinkler system had been activated, and people were pushing and shoving in the stairwell in an attempt to quickly get out of the building. As he descended the stairs, Mr. Ciarnella fell to the ground due to the wet steps and people pushing to escape the building. He suffered numerous injuries to his left shoulder, left wrist, neck, and back. *Id*. at ¶¶ 4-5.

Mr. Ciarnella struggled to get to his feet after his fall, but he continued down the stairwell until he reached the lobby area of the North Tower. In the lobby area of the North Tower, he saw

people who had been killed, those who had been burned beyond recognition, and others who had been severely injured by the blast in the North Tower. *Id*. at ¶ 6. He left the lobby area of the North Tower and exited onto the street level through 2 World Trade Center. As he entered the street, Mr. Ciarnella saw the second passenger jet, United Airlines Flight 175, collide with the upper section of the South Tower. He became engulfed by a thick cloud of smoke and falling debris as the South Tower collapsed, and he inhaled these substances into his lungs. *Id*. at ¶¶ 7-8. Mr. Ciarnella traveled north to escape the area and received assistance from an undercover police officer in a school bus. *Id*. at ¶ 10.

As a result of these terrorist attacks, Mr. Ciarnella suffered injuries to his left shoulder (including a torn rotator cuff that later required arthroscopic surgery to repair), his left hand, a herniated disc in his neck, and bulging discs in his back. He received several epidural injections and trigger point injections in his neck, back, and wrist over the subsequent years to alleviate his pain following these injuries. Further, Mr. Ciarnella developed asthma, chronic sinusitis, GERD, obstructive sleep apnea, and PTSD due to his experience on 9/11. *Id*. at ¶¶ 12-13.

### D.   John P. Cretella
### Injury Category: Escape/Building Collapse Injuries
### Severity: Significant

On September 11, 2001, John P. Cretella worked as a maintenance employee with American Building Maintenance (ABM) at the WTC. *See* Eubanks Dec., Ex. E, Declaration of John P. Cretella at ¶ 3. He had been working on the 61st Floor of the WTC's North Tower setting up a classroom when the first passenger jet, American Airlines Flight 11, struck the upper section of the building and shook the entire building. Mr. Cretella headed to the emergency stairwell with other ABM employees to evacuate from the area. The stairwell filled with smoke, and people were pushing and shoving in an attempt to quickly get out of the building. *Id*. at ¶¶ 6-7. A water main burst as he reached the steps between the 9th and 10th Floors, and the blast of water pushed him

and others down an entire flight of steps. Mr. Cretella slammed into the concrete, and he injured his neck, back, and left shoulder. *Id*. at ¶ 8.

Mr. Cretella continued down the stairwell until he reached the Concourse area. Police officers directed him to move through the lobby area as water poured from the ceiling and accumulated on the floor. As he entered the street, the South Tower collapsed and Mr. Cretella became engulfed by a thick cloud of smoke and debris. He inhaled significant quantities of debris into his lungs, and he lost visibility. *Id*. at 11. Mr. Cretella stumbled away from the area to safety and took a ferry across the river from New York City to New Jersey. *Id*. at ¶¶ 9-12. As a result of these terrorist attacks, Mr. Cretella suffered injuries to his lower back and left shoulder, and he further developed asthma, chronic rhinosinusitis, and PTSD. *Id*. at ¶¶ 14-15.

> **E.    James Csorny**
> **Injury Category: Building Collapse Injuries**
> **Severity: Significant**

On September 11, 2001, James Csorny worked with the Fire Department of New York (FDNY) at Ladder 10 with the rank of Lieutenant. *See* Eubanks Dec., Ex. F, Declaration of James Csorny at ¶ 4. When the first passenger jet, American Airlines Flight 11, struck the North Tower, Mr. Csorny immediately traveled towards the WTC area. He stopped at the Fire Department of Fort Hamilton on the way to transfer into a FDNY vehicle. As he approached his duty station with Ladder 10 (located directly across from the WTC on Liberty and Greenwich Streets) his vehicle path had been blocked by the debris from the collapsed South Tower. Mr. Csorny traveled on foot at around Church and Liberty Streets towards the WTC area. *Id*. at ¶¶ 5-8. As the North Tower collapsed, Mr. Csorny was buried by building debris, and the force of the impact with the debris caused a significant injury to his lower back. Also, due to the thickness of the debris cloud, he inhaled large quantities of these substances into his lungs and airways. *Id*. at ¶ 8. Mr. Csorny

cleared the debris from around his body, and he helped to remove building debris from around several firefighters in his immediate area. He then regrouped with other firefighters and immediately began the search-and-rescue effort in the area that later became known as Ground Zero. *Id*. at ¶¶ 9-10. Despite his injuries, Mr. Csorny later worked as the FDNY officer in charge of the Global Positioning System (GPS) Unit at Ground Zero in the weeks and months after the events of 9/11. As a result of these terrorist attacks, he suffered injuries to his lower back (bulging discs), he developed a respiratory/pulmonary injury, and he suffered from post-traumatic stress disorder. *Id*. at ¶¶ 11-12.

 **F.** **Hipolito D'Oleo**
   **Injury Category: Escape/Building Collapse Injuries**
   **Severity: Significant**

 On September 11, 2001, Hipolito D'Oleo worked as a maintenance employee with American Building Maintenance (ABM) at the WTC. *See* Eubanks Dec., Ex. G, Declaration of Hipolito D'Oleo at ¶ 3. He had been working on the 85th Floor of the WTC's South Tower when the first passenger jet, American Airlines Flight 11, struck the upper section of the North Tower. Mr. D'Oleo and others fled to the emergency stairwell to evacuate from the building. At the 40th floor, he felt the building rumble and shake, and people in the stairwell began to panic, scream, and they began to run down the stairs. *Id*. at ¶¶ 4-5.

 After descending the stairwell and leaving the building. Mr. D'Oleo saw the South Tower begin to collapse behind him. He ran away from the area but fell near One Chase Plaza and became engulfed in a massive debris cloud. *Id*. at ¶¶ 6-7. Mr. D'Oleo fell a second time while continuing to run away from the area and injured his shoulder and his hand as his body slammed against the pavement. Mr. D'Oleo eventually escaped from the area and he walked to his home located in the Bronx. As a result of these terrorist attacks, he suffered multiple injuries to his right shoulder and right hand, and he suffered from PTSD due to his experience on 9/11. *Id*. at ¶¶ 8-11.

G.     **Barbara Einzig**
       **Injury Category: Escape/Pulmonary Trauma Injuries**
       **Severity: Significant**

On September 11, 2001, Barbara Einzig lived and worked as a business consultant from her home apartment on the 27th floor of the Gateway Plaza apartment building, which is a residential apartment building that was closest to the WTC Towers. *See* Eubanks Dec., Ex. H, Declaration of Barbara Einzig at ¶ 4. She had been working from home when American Airlines Flight 11 plunged into the upper section of the North Tower. *Id*. at ¶ 5. Following the impact, she went downstairs from her apartment to the Gateway Plaza parking garage, located where South End Avenue ends across the street from the Financial Center, immediately adjacent to the South Tower. She saw horrific scenes as numerous people jumped to their deaths from the North Tower. *Id*.

When the second passenger jet, United Airlines Flight 175, struck the South Tower, Mrs. Einzig turned from the base of the South Tower and ran to escape from the area. She attempted to escape from the area and the falling debris through the back gate of the property but it was locked. Mrs. Einzig jumped down from a retaining wall to escape the carnage in the area, but she severely injured her right ankle in the process. *Id*. at ¶ 6. Despite her right ankle injury, Mrs. Einzig fled up the esplanade by the West Side highway to escape from the area, hearing the collapse of the South Tower and the screaming without knowing what had just happened. As the North Tower later imploded and collapsed, she had managed to escape to an area that was a number of blocks north. During her escape from the area, Mrs. Einzig became coated with the WTC building dust and debris. *Id*. at ¶ 7. She located a friend and stayed in her apartment on the Lower East Side after the 9/11 attacks had ended.

Mrs. Einzig returned to her apartment on September 12, 2001, and she saw massive amounts of contaminated dust, debris, and material in the Gateway Plaza building. *Id*. at ¶ 8. While later cleaning the dust and debris from her Gateway Plaza apartment, Mrs. Einzig experienced

increasing respiratory symptoms so she sought immediate medical treatment. *Id*. at ¶¶ 9-10. As a result of these attacks, Mrs. Einzig suffered a right ankle injury (right posterior tibial tendonitis/dysfunction), World Trade Center cough, gastroesophageal reflux disease (GERD), asthma (obstructive airway disease), sinusitis (upper respiratory disease), and skin cancer (basal cell carcinoma). *Id*. at ¶ 11.

      **H.    Fausto Antonio Gomez**
              **Injury Category: Escape/Building Collapse Injuries**
              **Severity: Significant**

On September 11, 2001, Fausto Antonio Gomez worked as a maintenance employee with American Building Maintenance (ABM) at the WTC. *See* Eubanks Dec., Ex. I, Declaration of Fausto Antonio Gomez at ¶ 3. He had been working on the 5th Floor Concourse Level of the WTC's North Tower when the first passenger jet, American Airlines Flight 11, struck the upper section of the North Tower. *Id*. at ¶ 4. Mr. Gomez ran towards the emergency exit stairwell to escape from the building. The stairwell began to shake and collapse and disintegrate beneath his feet. Everyone in the stairwell began to scream and panic, and Mr. Gomez fell to the floor and people trampled over him. Mr. Gomez slammed against the concrete steps, and he suffered injuries to his head, neck, chest, back, shoulders, right thumb, and both hips. *Id*. at ¶¶ 5-6.

Despite his injuries, Mr. Gomez exited the stairwell on the First Floor of the North Tower. As he looked back at the North Tower, Mr. Gomez saw horrific scenes of people jumping from the upper sections of the building and plunging to their deaths. He then watched in horror as the second passenger jet, United Airlines Flight 175, slammed into the upper section of the South Tower. As he stood in shock while watching the carnage and destruction unfold at the WTC, the South Tower began to collapse. As he ran from the area, Mr. Gomez became engulfed in a thick cloud of smoke, chemicals, and building debris. *Id*. at ¶¶ 7-9. He walked in darkness until he could see daylight to escape from the debris cloud and the area. In all, Mr. Gomez suffered 9/11-related

injuries to his head, back, chest, right thumb, and hips. He further suffered from a temporomandibular joint disorder ("TMJ"), as well as asthma. *Id*. at ¶¶ 10-11.

I.    **Thomas J. Grogan**
      **Injury Category: Building Collapse Injuries**
      **Severity: Significant**

On September 11, 2001, Thomas J. Grogan worked as a police officer with the Port Authority of New York-New Jersey. *See* Eubanks Dec., Ex. J, Declaration of Thomas J. Grogan at ¶ 3. He learned from a phone call and radio transmissions that passenger jets had struck the North and South Towers of the WTC, so he drove to the World Trade Center to provide aid and support to his fellow officers. Officer Grogan ran on foot towards the WTC area, and when he arrived at the corner of West and Vesey Streets, he heard the North Tower collapse. He ran north on West Street and crossed over Barclay Street in an effort to escape from the massive debris cloud that had formed during the collapse of the North Tower. *Id*. at ¶¶ 5-9.

Officer Grogan dove for cover and injured his left shoulder. He was engulfed by the debris cloud, and he inhaled large quantities of dust and debris into his lungs and airways. He later shared a Scott air pack (breathing apparatus) with other rescue personnel, and he escaped from the debris cloud as the smoke and dust began to dissipate. *Id*. at ¶¶ 10-13. Due to his injuries, Officer Grogan walked to the Holland Tunnel where he secured a ride to St. Mary's Hospital for the initial treatment of his 9/11-related injuries. As a result of these terrorist attacks, Officer Grogan suffered injuries to his left shoulder (which required surgical intervention), as well as asthma, chronic sinusitis, chronic rhinitis, esophageal reflux with barrettes esophagus, COPD, obstructive sleep apnea, and PTSD. *Id*. at ¶¶ 15-16.

**J.      Vincent J. Panaro**
**Injury Category: Building Collapse Injuries**
**Severity: Significant**

On September 11, 2001, Vincent J. Panaro worked as a firefighter with the Fire Department of New York. *See* Eubanks Dec., Ex. L, Declaration of Vincent J. Panaro at ¶ 4. When the first passenger jet, American Airlines Flight 11, struck the North Tower, Mr. Panaro and other firefighters with his unit responded to the WTC area. While responding to a "mayday" call from fellow firefighters inside WTC 7, the North Tower collapsed near Mr. Panaro's position and he was struck by falling debris and became trapped beneath a pile of rubble. He received injuries to his neck, back, elbows, and hips, and he inhaled large quantities of toxic dust and building debris into his lungs and airways. Mr. Panaro escaped from underneath the pile of debris and sought immediate treatment for his injuries. Specifically, as a result of these terrorist attacks, he suffered injuries to his neck (cervical spine), lumbar spine, shoulders, elbows, hips, and wrists. Further, he now suffers from fifty percent hearing loss, shortness of breath, headaches, fatigue, and reduced pulmonary function. *Id*. at ¶¶ 4-8.

The terrorist attacks were also emotionally devastating to Mr. Panaro. After the events of 9/11, he was the lone surviving backup bugler for the FDNY, so he had to attend and play the bugle at two funerals per day (and on one occasion, three funerals in one day) for other fallen members of the FDNY in the days, weeks, and months after the 9/11 attacks. Mr. Panaro's experience in attending those heartbreaking funerals was incredibly draining for him from an emotional and physical standpoint. He continues to struggle with the emotional distress of his experiences on and after 9/11. *Id*. at ¶ 9.

### K.      Milcia C. Pena
###          Injury Category: Escape/Building Collapse Injuries
###          Severity: Significant

On September 11, 2001, Milcia C. Pena worked as a Front Desk Training Manager at the Marriott World Trade Center. *See* Eubanks Dec., Ex. M, Declaration of Milcia C. Pena at ¶ 3. When the first passenger jet, American Airlines Flight 11, plunged into the upper section of the North Tower, Mrs. Pena had been running reports in the First-Floor lobby area of the Marriott WTC. She felt the impact of the explosion inside of the hotel, but first responders initially told her to remain inside of the Marriott for her safety. *Id.* at ¶¶ 4-5. When the second passenger jet, United Airlines Flight 175, slammed into the upper section of the South Tower, she exited the building as firefighters told her to cover her head and not to look back. The firefighters told Mrs. Pena to run towards the water to escape, but she had trouble running as she was wearing a hotel uniform and high heels. The crowd of people fleeing the area trampled over Mrs. Pena, and she suffered injuries to her lower back, left ankle, neck, left shoulder, and right leg as she attempted to escape. *Id.* at ¶¶ 5-9.

Having been injured, Mrs. Pena stumbled to her feet and attempted to flee the area. The South Tower then collapsed, and a thick cloud of smoke, chemicals, and building debris engulfed her and she inhaled large quantities of dust and debris. She walked several hours away from the WTC until she reached her mother's apartment in upper Manhattan. *Id.* at ¶ 11. As a result of these terrorist attacks, Mrs. Pena suffered injuries to her lower back, her right leg, her left ankle, and a TMJ disorder. She further suffered inhalation injuries, including interstitial lung disease, chronic rhinosinusitis, migraines, and GERD. *Id.* at ¶¶ 10-12.

## IV.   Conclusion

For all of the reasons set forth herein, as well as those set forth in the submissions of the other Plaintiffs in this case and Plaintiffs in the other 9/11 related cases in the *In re Terrorist*

*Attacks on September 11, 2001* multidistrict litigation, the *Burnett/Iran* Plaintiffs identified in Exhibit A respectfully request that this Court award them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; (3) leave for the *Burnett*/*Iran* Personal-Injury Plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated:  March 26, 2024

Respectfully submitted,

**/s/** John M. Eubanks
John M. Eubanks, Esq.
Jodi Westbrook Flowers, Esq.
Robert T. Haefele, Esq.
John C. Duane, Esq.
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
Email: jeubanks@motleyrice.com
Email: jflowers@motleyrice.com
Email: rhaefele@motleyrice.com
Email: jeubanks@motleyrice.com

Attorneys for the *Burnett/Iran* Plaintiffs