UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

In re:

> TERRORIST ATTACKS ON
> SEPTEMBER 11, 2001

------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/19/2025__
```

03-MD-01570 (GBD)(SN)

REPORT &
RECOMMENDATION

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE GEORGE B. DANIELS:

This document relates to:

> Ashton v. al Qaeda Islamic Army, No. 02-cv-06977 (GBD)(SN)
> Burnett v. Islamic Republic of Iran, No. 15-cv-09903 (GBD)(SN)
> Ortiz v. Islamic Republic of Iran, No. 22-cv-03100 (GDB)(SN)

Twenty-five plaintiffs in three cases seek partial final default judgments for personal injuries sustained in the 9/11 Attacks. See ECF Nos. 9660, 9749, 9853, 9873, 9879, 9889.[1] One of those plaintiffs also seeks a default judgment as to liability against the Islamic Republic of Iran ("Iran"). See ECF No. 9853. The Court recommends granting their motions in part.

## BACKGROUND

The Court assumes familiarity with this multidistrict litigation and summarizes only the relevant procedural and factual background. The Court first set out its framework for personal injury damages in Burnett I. See ECF No. 5879. The framework divides injuries into three categories with corresponding damages: a baseline award ($7,000,000) for "severe" injuries, a downward departure ($5,000,000) for "significant" injuries, and an upward departure ($10,000,000) for "devastating" injuries. Id. at 6–10. For rare individuals with exceptionally

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

traumatic injuries, the Court has recommended damages above $10 million. See, e.g., ECF No. 5909 at 11–13 (awarding damages of $25,000,000 to a plaintiff whose injuries were "beyond devastating"). Because Burnett I relied upon a private right of action that is reserved for United States nationals, military personnel, and government employees, it also limited recovery to claims by United States nationals. 28 U.S.C. § 1605A(c). Numerous United States nationals have since recovered pain and suffering awards for their personal injuries on this basis. See, e.g., Burnett II, ECF No. 5888; Burnett III, ECF No. 5909; Ashton I, ECF No. 5914; Burnett IV, ECF No. 5932; Burnett V, ECF No. 7323.

Subsequently, the Court extended the Burnett I framework to claims brought by non-United States nationals under another exception to foreign sovereign immunity, 28 U.S.C. § 1605B(b), and under state tort law. See In re Terrorist Attacks on Sept. 11, 2001 ("In re 9/11"), No. 03-md-01570 (GBD)(SN), 2024 WL 4268663 (S.D.N.Y. Jan. 5, 2024) ("King R&R"), report and recommendation adopted by 2024 WL 1312504 (Mar. 26, 2024) ("King Opinion") (holding that non-United States nationals may bring claims through § 1605B(b) and under New York's assault and battery law). The Court saw "every reason to apply this framework to state law claims" to "promote the efficient adjudication of this litigation and, more importantly, restore a measure of parity to plaintiffs of different nationalities." King R&R, at *8.

The moving Plaintiffs are United States nationals and non-United States nationals. They seek pain and suffering damages for their personal injuries pursuant to § 1605A and § 1605B(b), respectively. The Court must therefore resolve (1) whether it has jurisdiction over their claims; (2) whether Defendants the Islamic Republic of Iran ("Iran"), the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, the "Iran Defendants") have defaulted; (3) whether the Iran Defendants are liable; and (4) if so, what damages are due.

**DISCUSSION**

## I.    The Court Has Jurisdiction Under the FSIA

The Foreign Sovereign Immunities Act ("FSIA") "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'" Federal Republic of Germany v. Philipp, 592 U.S. 169, 175 (2021) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)). As its name suggests, the FSIA makes foreign states immune from suit by default, conferring jurisdiction over actions only if they meet strict requirements. The Plaintiffs' suits clear these hurdles, so the Court has jurisdiction over their claims.

### A.    Subject Matter Jurisdiction

Under the FSIA, district courts have subject matter jurisdiction over nonjury civil actions brought *in personam* against foreign states if "one of several enumerated exceptions to immunity applies." Republic of Sudan v. Harrison, 587 U.S. 1, 4 (2019); see 28 U.S.C. §§ 1330(a), 1604.

The Burnett VIII, Burnett IX, and Ortiz Plaintiffs bring their claims under the exception codified at 28 U.S.C. § 1605A because they are United States nationals. See ECF Nos. 9660 (Burnett VIII), 9873 (Burnett IX), 9853 (Ortiz). In Burnett I, the Court found that it possessed subject matter jurisdiction under § 1605A because the statute allows U.S. nationals to hold a foreign state accountable for "acts of terrorism or the provision of material support or resources for acts of terrorism" when those acts are undertaken "by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency." ECF No. 5879 at 2 (citing 28 U.S.C. § 1605A(a)(1)). The Court found that § 1605A applied to the Iran Defendants in the personal injury context because the Burnett Plaintiffs' injuries "occurred either as a direct result of the 9/11 attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of first responders attempting to assist the injured or endangered fleeing

from the scene." Id. at 3. The same is true of the Burnett VIII, Burnett IX, and Ortiz Plaintiffs' injuries.

Damages are available under § 1605A "for personal injury or death" and include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). The Burnett VIII, Burnett IX, and Ortiz Plaintiffs seek pain and suffering damages for their personal injuries sustained during the 9/11 Attacks. Accordingly, the Court has subject matter jurisdiction over their claims under § 1605A.

Other Burnett Plaintiffs (Non-Nationals II and Non-Nationals III), who are barred from seeking relief under § 1605A because they are not United States nationals, identify 28 U.S.C. § 1605B(b) as the relevant exception to immunity. See ECF Nos. 9750, 9890. It provides:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by
>
> (1)    An act of international terrorism in the United States; and
>
> (2)    A tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

Id. § 1605B(b).

The Burnett Plaintiffs' claims plainly satisfy many of 28 U.S.C. § 1605B(b)'s requirements. They are seeking "money damages" from the Iran Defendants. Id.; see Burnett Am. Comp. at 1082–88, No. 15-cv-09903, ECF No. 53. Those damages are for "physical injur[ies]" sustained "in the United States" and "caused" by the 9/11 Attacks. 28 U.S.C. § 1605B(b); see Burnett Am. Comp. at 1081. And the 9/11 Attacks were "act[s] of international terrorism" on U.S. soil. 28 U.S.C. § 1605B(b); see Burnett Am. Comp. at 1081.

The <u>Burnett</u> Plaintiffs' claims also meet the final element required to satisfy § 1605B(b): that "a tortious act or acts of the foreign state" "caused" their injuries. In 2011, the Court heard evidence linking the Iran Defendants to the 9/11 Attacks. Based on that record, it found that Iran was "aware[] of[] and involve[d] in[]" al Qaeda's plans and provided "material support" to the terrorist group. <u>In re 9/11</u>, 2011 WL 13244047, at *26, 41 (S.D.N.Y. Dec. 22, 2011). It concluded that Iran's "material support" proximately "caused" the 9/11 Attacks and, by extension, the resulting injuries. <u>Id.</u> at *41. And it determined that the Islamic Revolutionary Guard Corps and the Central Bank of the Islamic Republic of Iran both fall under the FSIA's definition of a "foreign state." <u>Id.</u> (finding that the Islamic Revolutionary Guard Corps is a political subdivision of the Islamic Republic of Iran "legally identical to Defendant Iran for purposes [of] liability under the FSIA" and the Central Bank of the Islamic Republic of Iran "at all relevant times acted as [an] agent[] or instrumentalit[y] of [D]efendant Iran"). The evidence supporting those findings establishes this final element—that the Iran Defendants' "tortious act[s]" "caused" the <u>Burnett</u> Plaintiffs' injuries.

Though courts cannot take judicial notice of factual findings made in another case and rely on them "for the truth of the matter asserted," <u>Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.</u>, 146 F.3d 66, 70 (2d Cir. 1998) (cleaned up), the FSIA "does not require courts to relitigate issues that have already been settled in previous decisions," <u>Lee v. Islamic Republic of Iran</u>, 518 F. Supp. 3d 475, 480 (D.D.C. 2021) (cleaned up). The Court leverages that practice here and finds that the <u>Burnett</u> Plaintiffs' claims, brought *in personam* against the Iran Defendants, meet all the requirements of the § 1605B(b) exception to sovereign immunity. <u>See</u> <u>Burnett</u> Am. Comp., No. 15-cv-09903, ECF No. 53. The Court therefore has

subject matter jurisdiction over the non-U.S. national Burnett Plaintiffs' claims. 28 U.S.C.
§ 1330(a).

The Ashton Plaintiff, meanwhile, raises both § 1605B(b) and the Alien Tort Statute (28
U.S.C. § 1350) as bases for the Court's subject matter jurisdiction over their claim. See ECF No.
9879 at 5, 8 n.5. The Alien Tort Statute, however, only "affords jurisdiction for suits against
private defendants, not against foreign sovereigns." Mohammadi v. Islamic Republic of Iran, 782
F.3d 9, 17 (D.C. Cir. 2015) (finding no subject matter jurisdiction over claims brought by non-
U.S. nationals against Iran under the Alien Tort Statute). The Alien Tort Statute "does not confer
any waiver of foreign sovereign immunity." Id. (citing Argentine Republic v. Amerada Hess
Shipping Corp., 488 U.S. 428, 438–39 (1989)). In fact, the FSIA "provides the *sole* basis for
obtaining jurisdiction over a foreign state in federal court." Amerada Hess, 488 U.S. at 439
(emphasis added). The Alien Tort Statute, therefore, does not afford the Court jurisdiction over
the Ashton Plaintiff's claim against Iran.

The Ashton claim does, however, meet the requirements for an exemption to foreign
sovereign immunity under § 1605B(b). Like the Burnett Plaintiffs, the Ashton Plaintiff is seeking
"money damages" from Iran. 28 U.S.C. § 1605B(b); see Ashton Am. Comp. at 3–9, No. 03-md-
01570, ECF No. 3237 (adopting Ashton Sixth Am. Comp., 02-cv-06977, ECF No. 465). Those
damages are for "physical injur[ies]" sustained "in the United States" and "caused" by the 9/11
Attacks. 28 U.S.C. § 1605B(b); see Ashton Am. Comp. at 5. The 9/11 Attacks were "act[s] of
international terrorism" on U.S. soil. 28 U.S.C. § 1605B(b); see Ashton Am. Comp. at 5. And the
Ashton complaint invokes the same evidence the Court considered in 2011, when it concluded
that Iran's "material support" proximately "caused" the 9/11 Attacks. In re 9/11, 2011 WL
13244047, at *41; see Ashton Am. Comp. at 3. A "tortious act or acts of the foreign state"

therefore "caused" the Ashton Plaintiff's injury and the Court possesses subject matter jurisdiction over the Ashton Plaintiff's claims. 28 U.S.C. § 1605B(b).

Accordingly, the Court has subject matter jurisdiction over all the claims at issue.

## B. Personal Jurisdiction

With subject matter jurisdiction established, personal jurisdiction is simply a matter of showing "valid service of process." Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 104 (2d Cir. 2017) (cleaned up); accord 28 U.S.C. § 1330(b). Service on the Iran Defendants is also governed by the FSIA.

The FSIA specifies four methods of serving foreign states or their political subdivisions in descending order of preference. See 28 U.S.C. § 1608(a). The first, service by "special arrangement," was impossible because neither the Burnett Plaintiffs, the Ortiz Plaintiff, or the Ashton Plaintiff have such an arrangement with Iran or its political subdivision the Islamic Revolutionary Guard Corps. Id. § 1608(a)(1). The second, service according to an "international convention on service of judicial documents," was unavailable because there is no service convention between the U.S. and Iran. 28 U.S.C. § 1608(a)(2). The third, service by registered "mail," proved ineffective; the Clerk of Court mailed the requisite documents in all cases, but Iran and Islamic Revolutionary Guard Corps failed to acknowledge receipt in the Burnett case, and Iran "rejected" the Ortiz mailing and ignored the Ashton mailing. 28 U.S.C. § 1608(a)(3); see No. 15-cv-09903, ECF No. 55; No. 22-cv-03100, ECF No. 10; 02-cv-06977, ECF No. 424. The fourth, service via "diplomatic channels," finally succeeded. 28 U.S.C. § 1608(a)(4); Aff. of Service, No. 15-cv-09903, ECF No. 64; Aff. of Service, No. 22-cv-03100, ECF No. 8; Aff., No. 02-cv-06977, ECF No. 424 at 2.

For agencies or instrumentalities of foreign states, the FSIA sets out a separate list of three potential methods of service, also in descending order of preference. See 28 U.S.C.

§ 1608(b). The first is again service by "special arrangement." 28 U.S.C. § 1608(b)(1). Service was impossible under this method because the <u>Burnett</u> Plaintiffs have no such arrangement with the Central Bank of the Islamic Republic of Iran. <u>See, e.g.</u>, Pls.' Mem. of Law at 7, ECF No. 9734. The second method, which allows for service to be delivered "to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States," or according to an "international convention on service of judicial documents," did not apply. 28 U.S.C. § 1608(b)(2). So, as permitted by the third method, the <u>Burnett</u> Plaintiffs attempted service by registered "mail," which succeeded. 28 U.S.C. § 1608(b)(3)(B); <u>see</u> Aff. of Service, No. 15-cv-09903, ECF No. 64.

Because the Plaintiffs properly effectuated service under 28 U.S.C. § 1608(a)(4) and 28 U.S.C. § 1608(b)(3) on claims within the Court's subject matter jurisdiction, the Court has personal jurisdiction over the Iran Defendants.

## II.    The Iran Defendants Defaulted

After the Plaintiffs effectuated service, the Iran Defendants had "sixty days" to "serve an answer or other responsive pleading." 28 U.S.C. § 1608(d). The Iran Defendants did not respond or otherwise appear in that time or since. The Clerk of Court entered Certificates of Default against the Iran Defendants on December 5, 2016 (<u>Burnett</u>), and against Iran on December 22, 2011 (<u>Ashton</u>) and September 25, 2023 (<u>Ortiz</u>). <u>See</u> Clerk's Certificate of Default, No. 15-cv-09903, ECF No. 67; Clerk's Certificate of Default, 02-cv-06977, ECF No. 651; Clerk's Certificate of Default, No. 22-cv-03100, ECF No. 11.

## III.   The Iran Defendants Are Liable

### A.   <u>Burnett</u>

The Court granted the <u>Burnett</u> Plaintiffs default judgment as to liability. <u>See</u> 15-cv-09903, ECF No. 85. That decision arose under 28 U.S.C. § 1605A(c), meaning it applied only to

8

United States nationals. The Iran Defendants thus remain liable to the moving <u>Burnett</u> Plaintiffs who are United States nationals.

The <u>Burnett</u> Plaintiffs who are not United States nationals ask the Court to award them pain and suffering damages for their personal injuries under the same assault and battery theory the Court analyzed in <u>King</u>. In that opinion, the Court confirmed that a non-U.S. national could hold Iran liable under New York's assault and battery law for the personal injuries they sustained in the 9/11 Attacks. <u>See</u> <u>King Opinion</u>. The Court had "little trouble finding that the al Qaeda hijackers committed assault and battery" and "that Iran both knew of and substantially assisted al Qaeda's attacks on the United States." <u>King Opinion</u>, at *5. The Court thus found Iran liable.

The <u>King</u> decision turned on the same evidence that now underpins the <u>Burnett</u> Plaintiffs' claims. <u>See</u> <u>King Opinion</u>, at *3 n.3. Indeed, the <u>King</u> Plaintiff adopted the <u>Burnett</u> Amended Complaint. <u>See</u> Compl., No. 22-cv-05193, ECF No. 1 (<u>Burnett</u> complaint adopted via short form in <u>King</u>). The <u>Burnett</u> Plaintiffs have thus pleaded the very same factual allegations that cogently charge Iran with legal responsibility for their injuries:

- **"Iran . . . entered into an alliance with al-Qaeda** . . . to work together to conduct terrorist operations against the United States." <u>Burnett</u> Am. Compl., No. 15-cv-09903, ECF No. 53 ¶ 4976.

- Through that partnership, **"Iran . . . had actual foreknowledge of[] . . . the 9/11 [A]ttacks** . . . [,] which were carried out by members of al-Qaeda." <u>Id.</u> ¶ 5006.

- In the lead up to 9/11, **"Iran . . . assist[ed] in, and contribut[ed] to, the preparation and execution of the plans" for the Attacks**, <u>id.</u> ¶ 4951, including by providing "instruction, training, direction, financing, and support" to al Qaeda, <u>id.</u> ¶ 5031.

- **"In furtherance of those plans, the al-Qaeda hijackers deliberately caused planes to crash into** the World Trade Center Towers, the Pentagon, and a field in Shanksville, Pennsylvania on September 11, 2001." <u>Id.</u> Those Attacks "**resulted in** the murder of the 2,976 Decedents and **injuries** to other plaintiffs," including the <u>Burnett</u> Plaintiffs. <u>Id.</u> ¶ 5017.

Applying these facts to New York's assault and battery law, the Court has "little trouble" finding the Iran Defendants liable to the <u>Burnett</u> non-national Plaintiffs. <u>King Opinion</u>, at *5. Assault and battery claims turn on largely overlapping elements. Committing an "assault involves putting" the plaintiff in "fear" or apprehension of a battery. <u>Rivera v. State</u>, 34 N.Y.3d 383, 389 (2019) (cleaned up). A battery, in turn, requires someone to "intentionally" and "unjustifiably" "cause" harmful or offensive "contact" with the plaintiff. <u>Id.</u> (cleaned up). Qualifying contact can be made by the person himself or "by means of an instrumentality." <u>Aberbach v. Biomedical Tissue Servs., Ltd.</u>, 48 A.D.3d 716, 718 (2d Dep't 2008).

Importantly, liability for assault and battery extends beyond the principal tortfeasor to those who aided and abetted him. <u>See</u> <u>Lindsay v. Lockwood</u>, 625 N.Y.S.2d 393, 396–98 (N.Y. Sup. Ct. 1994). To prevail on an aiding and abetting theory, the plaintiff must show that: (1) a third party's "wrongful act" injured the plaintiff, (2) the defendant "knowingly and substantially assisted" the third party's misconduct, and (3) the defendant was "aware of his role" in "tortious activity" when he gave that assistance. <u>Id.</u> at 397 (cleaned up); <u>accord</u> <u>Halberstam v. Welch</u>, 705 F.2d 472, 477 (D.C. Cir. 1983). A defendant's assistance may come in "words or [actions]," <u>McKiernan v. Vaccaro</u>, 168 A.D.3d 827, 830 (2d Dep't 2019), but must "connect[]" him to the misconduct that "caus[ed] the injury," <u>Lindsay</u>, 625 N.Y.S.2d at 397. When deciding whether a defendant's conduct meets this standard, New York courts consider "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relations to the [tortfeasor,] and his state of mind." <u>Id.</u> (quoting Restatement (Second) of Torts § 876 cmt. d (Am. L. Inst. 1979)).

In plain terms, the Iran Defendants are liable for aiding and abetting assault and battery if: (a) al Qaeda intentionally used a hijacked aircraft to injure and inspire fear in 9/11 victims,

including the <u>Burnett</u> Plaintiffs; and (b) Iran knew of al Qaeda's plan to attack the United States and gave the terrorist organization substantial help in carrying out its strike. The evidence presented in 2011, combined with the <u>Burnett</u> Plaintiffs' affidavits and medical records, leaves little room for debate on either point. <u>See</u> <u>In re 9/11</u>, 2011 WL 13244047; ECF Nos. 9751, 9891.

The Plaintiffs' evidence establishes that the 9/11 hijackers committed assault and battery. Al Qaeda operatives turned passenger planes into ordnance and used them to bring down the Twin Towers, terrorizing and injuring thousands within the collapse zone. <u>See</u> <u>In re 9/11</u>, 2011 WL 13244047, at *1. The fear and physical trauma these victims experienced was unquestionably "intentional and offensive," <u>Rivera</u>, 34 N.Y.3d at 389—the direct product of al Qaeda's use of an aircraft as an "instrumentality" of destruction, <u>Aberbach</u>, 48 A.D.3d at 718.

The Plaintiffs' uncontroverted submissions similarly establish that the Iran Defendants aided and abetted the Attacks. Iran knew of "the plan to crash hijacked civilian airliners into American cities." <u>In re 9/11</u>, 2011 WL 13244047, at *22. "Iran provided direct support to al Qaeda specifically for th[ose] attacks" in the form of "planning, funding, facilitation of the hijackers' travel and training, and logistics, and . . . the provision of services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation." <u>Id.</u> at *40. That support "vastly increased the likelihood of the operational success of the 9/11 plot." <u>Id.</u> at * 16. New York courts have deemed people liable for aiding and abetting battery based on far less "substantial" assistance. <u>Lindsay</u>, 625 N.Y.S.2d at 397; <u>see, e.g.</u>, <u>Wilson v. DiCaprio</u>, 278 A.D.2d 25 (1st Dep't 2000) (affirming liability for assault and battery where defendant shouted encouragement for principal tortfeasors).

Altogether, this evidence "satisfactory[ily]" "establishes" the elements of assault and battery under New York law. 28 U.S.C. § 1608(e). Accordingly, the Court recommends entering a liability judgment on behalf of the non-U.S. national Burnett Plaintiffs.

### B. Ashton

The Ashton Plaintiff is also a non-U.S. national seeking default judgment against Iran. See Pl.'s Mot., ECF No. 9879. The Ashton motion, however, raises only one cause of action—the private right of action contained in § 1605A. See id. The Court's previous Ashton liability judgment was also premised on § 1605A. ECF No. 3014. As explained *supra*, non-U.S. nationals like the Ashton Plaintiff cannot request relief under § 1605A. The Ashton Plaintiff must attempt to hold Iran liable pursuant to another cause of action.

But the Ashton Plaintiff has not done so. A plaintiff is "required to identify, and to bring his claims pursuant to, some . . . 'cause of action arising out of a specific source of law'—for example, state law." Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 840 (D.C. Cir. 2009) (quoting Acree v. Republic of Iraq, 370 F.3d 41, 59 (D.C. Cir. 2004), abrogated on other grounds by Republic of Iraq v. Beaty, 556 U.S. 848 (2009)). And while a plaintiff need not "identify the specific source of law in his complaint," she does "have to do so at an appropriate time in the litigation." Oveissi, 573 F.3d at 840. Therefore, the Court directed the Ashton Plaintiff to refile their motion and assert a new cause of action (e.g., assault and battery under New York law) that comports with the Court's § 1605B jurisdiction. See ECF No. 10708. The Court recommends denying the Ashton Plaintiff's current motion without prejudice and assessing their refiled motion once it is filed.

### C. **Ortiz**

Finally, the Ortiz Plaintiff seeks default judgment as to liability against Iran. See Pl.'s Mot., ECF No. 9853. The Ortiz Plaintiff is a U.S. national whose personal representative brings their claim under § 1605A. Id. Their motion also incorporates the evidence that the Court considered in its 2011 decision. See Pl.'s Mem. of Law, ECF No. 9854. For U.S. nationals like Mr. Ortiz, the Court has continuously leveraged its ability to avoid "relitigat[ing] issues that have already been settled in previous decisions"—granting numerous default liability judgments based on this same underlying evidence. Lee v. Islamic Republic of Iran, 518 F. Supp. 3d at 480; see, e.g., ECF No. 9416 (granting a default liability judgment based on the 2011 hearing and evidence). The Court recommends doing so here and finding Iran liable to the Ortiz Plaintiff.

### IV.    **The Plaintiffs Are Entitled to Damages**

With jurisdiction and liability established for the Burnett and Ortiz Plaintiffs, the only remaining question is damages. "The Court has written extensively about pain and suffering awards for personal injuries in the 28 U.S.C. § 1605A(c) context." King R&R, at *8. And for victims of assault and battery—those non-U.S. national Plaintiffs moving under § 1605B(b)—compensatory damages are recoverable under New York law. See Allam v. Meyers, 906 F. Supp. 2d 274, 286–94 (S.D.N.Y. 2012); Restatement (Second) of Torts § 924 (Am. L. Inst. 1979). All of the moving Plaintiffs, therefore, are entitled to damages.

The Plaintiffs seek compensatory damages for the pain and suffering traceable to the personal injuries they sustained in the 9/11 Attacks. The Court's familiar Burnett I framework categorizes these injuries into three groups with corresponding awards: a baseline award ($7,000,000) for "severe" injuries, a downward departure ($5,000,000) for "significant" injuries, and an upward departure ($10,000,000) for "devastating" injuries. ECF No. 5879 at 6–10. For rare individuals with exceptionally traumatic injuries, the Court has recommended damages

above $10 million. See, e.g., ECF No. 5909 at 11–13 (awarding damages of $25,000,000 to a plaintiff whose injuries were "beyond devastating"). Conversely, "[t]he absence of medical records supporting and providing further information regarding an affiant's claims may support a downward departure in an award determination." ECF No. 5879 at 9.

The Court analyzes each of the Plaintiffs' claims for pain and suffering individually based on this framework.

### A. __Burnett VIII__, ECF No. 9660

### Scott Roy Beloten

On September 11, 2001, Scott Roy Beloten was a paramedic on duty in the ambulance department of Maimonides Medical Center. ECF No. 9663-2 ¶ 3. His unit was called to respond to the World Trade Center area shortly after the second plane struck the South Tower. Id. ¶ 4. When he arrived, he witnessed people jumping to their deaths from both towers. Id. ¶ 5. Some landed close to him. Id. He described the scene as "chaotic and horrific," with "body parts everywhere"—"like a war zone." Id. ¶ 5.

A piece of sheet metal, falling from one of the towers, then "slammed" into Mr. Beloten. Id. ¶ 6. It left multiple lacerations on his hands and fingers, and injured his forearm and neck. Id. Nevertheless, he continued into the nearby Marriott hotel to help other injured people. Id. ¶¶ 6, 7. But the South Tower soon collapsed onto the Marriott building, "engulf[ing]" Mr. Beloten in "a thick cloud of smoke, chemicals, and building debris." Id. He further injured both of his hands, wrists, arms, and left knee. Id. ¶ 7.

Mr. Beloten exited the Marriott while he helped an injured EMT out of the debris. Id. ¶¶ 8, 9. He and other paramedics transported the EMT towards the North Tower to retrieve emergency supplies from ambulances stationed nearby. Id. ¶ 9. Then the North Tower collapsed.

Id. Mr. Beloten was again "engulfed in a thick cloud of smoke, chemicals, and building debris" as "[a]nother massive debris cloud rained down upon [him]." Id. He reports that he "inhaled massive quantities of these substances into [his] lungs and airways, and [his] eyes and throat continued to burn from the exposure to these harmful substances in the air." Id.

His medical records confirm his multiple injuries, including those to his hands, wrists, and knees that have required multiple surgeries. Id. Ex. C. They also confirm diagnoses for depression, anxiety, asthma, bronchitis, rhinitis, reactive airway dysfunction syndrome, gastroesophageal reflux disease ("GERD"), and post-traumatic stress disorder ("PTSD"). Id. The Court finds that these are severe injuries and therefore recommends a $7 million award.

**Maria E. Castillo**

Maria Castillo worked as a security guard on the World Trade Center property. ECF No. 9663-3 ¶ 3. When the first plane struck the North Tower, she felt the building tremble and ran upstairs to inspect the area. Id. ¶¶ 4, 5. She began to direct people to safety, but "a mass of people" ignored her instructions and "trampled" her instead. Id. ¶ 5. She reports that the stampede injured her back, neck, and right knee. Id.

Mrs. Castillo then went to the South Tower to get her bag. Id. ¶ 7. There, she stopped and helped to evacuate hundreds of people through the revolving doors. Id. But as the South Tower began to collapse, she ran. Id. ¶ 9. A "massive cloud of smoke, chemicals, and building debris consumed [her]," and she fell to the ground once again. Id. ¶¶ 9, 10. Another crowd trampled her. Id. ¶ 10. Her medical records confirm her injuries to her back, as well as her depression and PTSD. Id. Ex. B. The Court therefore finds that her injuries are significant and recommends a $5 million award.

**Anthony Ciarnella**

Anthony Ciarnella was working on the 10th floor of the North Tower of the World Trade Center on September 11, 2001, when the first plane hit. ECF No. 9663-4 ¶¶ 3, 4. He was a Vice President and Manager of Customer Service at Bank of America. Id. ¶ 3. Alongside his coworkers, Mr. Ciarnella rushed to a stairwell to escape the building. Id. ¶ 5. The building's sprinkler system had been activated, so the stairs were wet. Id. People were pushing and shoving. Id. Mr. Ciarnella fell and injured his left shoulder, left wrist, neck, and back. Id.

When Mr. Ciarnella reached the lobby, he saw people who had been killed by the blast in the North Tower as well as others who were "burned beyond recognition." Id. ¶ 6. He exited onto the street and saw the second plane strike the South Tower. Id. ¶ 7. As he ran to escape "the chaos and carnage," the South Tower collapsed. Id. ¶ 8. He was "engulfed by a thick cloud of smoke, chemicals, and falling debris" and inhaled "massive quantities" of the toxins into his lungs. Id.

Mr. Ciarnella suffered injuries to his left shoulder (including a torn rotator cuff that later required arthroscopic surgery to repair), his left hand, his neck, and his back. Id. ¶ 12. He has since received several injections to alleviate the pain from these injuries. Id. He also developed asthma, chronic sinusitis, GERD, obstructive sleep apnea, and PTSD. Id. ¶¶ 12, 13. His medical records confirm these injuries. Id. Ex. B. Because the Court finds that Mr. Ciarnella's torn rotator cuff and subsequent arthroscopic surgery are "significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery," not "severe orthopedic trauma requiring significant or multiple surgeries," it recommends granting a $5 million award consistent with such "significant" injuries. See Burnett I at 6–8, ECF No. 5879.

This award is in line with the Court's other recommendations, which award $5 million for similar surgeries.

**John P. Cretella**

By September 11, 2001, John P. Cretella had worked as a maintenance employee with American Building Maintenance for 19 years. ECF No. 9663-5 ¶ 3. On the morning of 9/11, Mr. Cretella was working on the 61st floor of the World Trade Center's North Tower setting up a classroom when American Airlines Flight 11 struck the North Tower. Id. ¶ 4. The "incredible impact shook the building" and sent Mr. Cretella falling to the floor. Id. ¶ 4. The "floor buckled." Id. Mr. Cretella "quickly rose to [his] feet" and crowded into the emergency stairwell. Id. ¶ 5. The stairwell was full of other people trying to escape; soon, it was also filled with smoke. Id. ¶ 6.

When Mr. Cretella reached the stairs between the 9th and 10th floors, a water main burst—the "blast of water pushed [him] and others down an entire flight of steps." Id. ¶ 8. He reports that he injured his neck, back, and left shoulder as he "slammed into the concrete floor." Id.

He made it outside. There, he witnessed "blood all over the windows," dead bodies, and people who "had been burned beyond recognition." Id. ¶ 9. He saw "bodies explode" as people jumped to their deaths. Id. He saw the South Tower collapse and was quickly "engulfed by a thick cloud of smoke, chemicals, and falling debris" Id. ¶ 11. He "inhaled massive quantities of these substances into [his] lungs and airways." Id.

His medical records confirm that these terrible experiences resulted in injuries to his neck, lower back, and left shoulder; asthma and chronic rhinosinusitis; and PTSD. Id. Ex. C. He

remains "haunted by the visions of the events of 9/11 to this day." Id. ¶ 15. The Court finds that these injuries are significant and recommends a $5 million award.

**James Csorny**

James Csorny was a Lieutenant firefighter with Ladder 10 of the Fire Department of New York ("FDNY"). ECF No. 9663-6 ¶ 4. He was off duty on September 11, 2001, but upon hearing about "the emergency" downtown, he "immediately traveled" to the World Trade Center. Id. ¶ 6. By the time he arrived, the South Tower had already collapsed. Id. ¶ 7.

Confronted with the debris from the South Tower, Mr. Csorny ditched his vehicle and proceeded on foot towards Ladder 10, which was located directly across from the World Trade Center. Id. Then the North Tower collapsed. Id. ¶ 8. He was "buried by building debris, dust, smoke, and chemicals." Id. The "force of the impact" from the collapse "caused a significant injury to [his] lower back." Id. He inhaled "large quantities" of the toxins that surrounded him. Id. "After several minutes," he reports, he managed to stand back up. Id. ¶ 9. He continued towards the firehouse. Id. Then, reconnected with fellow firefighters, he "immediately began the search and rescue effort in the area that later became known as Ground Zero." Id. ¶ 10.

He faced a scene that was "almost indescribable." Id. It "looked like a war zone." Id. He witnessed "unimaginable death that will haunt [him] forever." Id. Still, Mr. Csorny spent the next five months at Ground Zero, supervising the Global Positioning System Unit tasked with finding body parts or personal belongings that might help identify the victims of the 9/11 Attacks. Id. ¶ 11.

Ms. Csorny's medical records confirm his injuries to his lower back, a respiratory/pulmonary injury, and PTSD. Id. Ex. C. The Court finds these injuries to be significant and thus recommends a $5 million award.

**Hipolito D'Oleo**

Hipolito D'Oleo worked as a maintenance employee with American Building Maintenance in the South Tower of the World Trade Center. ECF No. 9663-7 ¶ 3. On the morning of September 11, 2001, he was replacing paper towels in a bathroom on the 85th floor when a building mechanic rushed in screaming. Id. ¶ 4. "Fire! Fire!" the mechanic yelled. Id. Mr. D'Oleo fled to the emergency stairwell. Id. When he reached the 40th floor, he felt the building rumble and shake. Id. ¶ 5. People in the stairwell began to panic, scream, and run down the stairs. Id.

Finally outside, Mr. D'Oleo saw the South Tower—the building he was just in—collapse behind him. Id. ¶ 7. He ran, but fell, as a "large cloud of smoke and debris" chased him. Id. He fell a second time and "slammed" his body against the pavement, injuring his hand and shoulder. Id. He was "engulfed" by the cloud and "struggled to breathe" despite covering his face. Id. Then, he began the long walk home. He reached his home in the Bronx by 4:30 p.m. Id. ¶ 9.

Mr. D'Oleo has provided the Court with his medical records, which confirm multiple injuries to his right shoulder and right hand, as well as PTSD. Id. Ex. C. The Court finds these to be significant injuries and thus recommends a $5 million award.

**Barbara Einzig**

Barbara Einzig lived and worked as a business consultant from her apartment in Gateway Plaza, a residential building located across the street from the World Trade Center. ECF No. 9663-8 ¶ 4. When the first plane hit, Mrs. Einzig "heard an explosion" and left her apartment to investigate. Id. ¶ 5. Standing "immediately adjacent to the South Tower," she came upon a "horrific" scene: she witnessed numerous people jump to their deaths from the North Tower. Id.

When the second plane hit the South Tower, she turned and ran. Id. ¶ 6. She tried to escape the falling debris through the back gate of Gateway Plaza, but the gate was locked. Id. A retaining wall separated Gateway Plaza from the esplanade by the Hudson River; Mrs. Einzig jumped. Id. When she landed, she injured her right ankle. Id. As she escaped up the esplanade, the towers collapsed, and Mrs. Einzig was "coated" with "dust and debris." Id. ¶ 7. Her apartment was also covered in "building dust and debris." Id. ¶ 9.

Mrs. Einzig reports that she experienced increasing respiratory symptoms, nosebleeds, headaches, and rashes while cleaning the dust and debris from her apartment. Id. ¶ 10. She sought immediate medical treatment. Id. Her medical records confirm that she has suffered from a number of respiratory issues, and also include evidence of her right ankle injury and GERD. Id. Ex. B. The World Trade Center Health Program has also certified Mrs. Einzig's skin cancer diagnosis. Id. Ex. B, at 9. Mrs. Einzig continues to seek treatment for her emotional injuries with a psychotherapist. Id. ¶ 13. The Court finds that these injuries are significant and thus recommends a $5 million award.

### Fausto Antonio Gomez

Fausto Antonio Gomez was working on the 5th floor concourse of the North Tower when the first plane struck the tower's upper floors. ECF No. 9663-9 ¶ 4. He was a maintenance employee with American Building Maintenance. Id. ¶ 3. Mr. Gomez ran into the emergency stairwell, which was filled with other people pushing and shoving. Id. ¶ 5. The stairwell then "began to shake and collapse and disintegrate" beneath him. Id. ¶ 6. "Everyone in the stairwell began to scream and panic," Mr. Gomez explains, and he fell to the floor. Id. His head and body "slammed against the concrete," and he was trampled by others trying to escape. Id. He injured his neck, chest, back, shoulders, right thumb, and both hips. Id.

Despite his injuries and "determined to get out," Mr. Gomez continued down the stairs. Id. ¶ 7. The "stampede" of people forced Mr. Gomez to "crawl" towards the exit, where he was trampled once more. Id. But he made it out—only to witness the "carnage and destruction" around him. Id. ¶¶ 8, 9. He saw the second plane strike the South Tower and fled as it began to collapse. Id. ¶ 9. He was engulfed in a "thick cloud of smoke, chemicals, and building debris," which he inhaled. Id.

His medical records show that he suffered a cervical spine disorder, a chest wall contusion, bilateral shoulder derangement, a right thumb sprain, bilateral hip contusions, head trauma (including a concussion), and temporomandibular joint disorder ("TMJ"). Id. Ex. C. He also suffers from asthma and PTSD. Id. The Court finds that these injuries are significant and thus recommends a $5 million award.

**Thomas J. Grogan**

On September 11, 2001, Thomas J. Grogan worked as a police officer with the Port Authority of New York-New Jersey. ECF No. 9663-10 ¶ 3. Though he was only scheduled to work that afternoon, Officer Grogan reported for duty when he learned that a passenger jet had hit the North Tower. Id. ¶ 5. He approached the World Trade Center area on foot and heard the North Tower collapse. Id. ¶¶ 8, 9. Then, as a "massive debris cloud" formed behind him, he ran and dove for cover, injuring his left shoulder. Id. ¶¶ 9, 10. Still, he was "surrounded" by the thick debris cloud. Id. ¶ 10. He "inhaled large quantities of dust and debris" and "began to have difficulty breathing." Id.

As the dust began to settle, Officer Grogan walked to the Holland Tunnel. Id. ¶ 15. He hitched a ride to St. Mary's Hospital for treatment. Id. His medical records indicate that he suffered injuries to his left shoulder (which required surgical intervention) and continues to

suffer from asthma, chronic sinusitis, chronic rhinitis, esophageal reflux with barrettes esophagus, chronic obstructive pulmonary disease ("COPD"), obstructive sleep apnea, and PTSD. Id. Ex. B. These are significant injuries for which the Court recommends a $5 million award.

**Vincent J. Panaro**

Vincent J. Panaro was a firefighter with the FDNY on September 11, 2001. ECF No. 9663-11 ¶ 4. From the roof of his firehouse, he saw the second plane strike the South Tower. Id. Then, he and his unit got the call to respond. Id. At the World Trade Center, Mr. Panaro and his fellow firefighters devised a plan to rescue people trapped in the North Tower. Id. ¶ 6. They tried to pull others out from beneath the rubble. Id. All the while, they were "constantly showered from above" by falling debris. Id.

Mr. Panaro then responded to a "mayday" call from firefighters trapped inside World Trade Center 7. Id. He was near the North Tower when it collapsed. Id. Debris struck him "repeatedly" and he was trapped beneath the rubble. Id. He reports that he seriously injured his neck, back, elbows, and hips, and inhaled "large quantities of toxic dust and building debris." Id. His medical records demonstrate that he suffered injuries to his neck, lumbar spine, shoulders, elbows, hips, and wrists, and continues to suffer from shortness of breath, headaches, blurred vision, and asthma. Id. Ex. B. He also reports a fifty percent reduction in his hearing, which the Court could not confirm in his medical records. Id. ¶ 7.

Further, the 9/11 Attacks were "emotionally devastating" for Mr. Panaro. Id. ¶ 9. He was the only surviving backup bugler for the FDNY following the Attacks. Id. For months, he attended and played the bugle at two funerals per day, honoring his fellow firefighters as they were laid to rest. Id. Those funerals were "heartbreaking" and "incredibly draining," Mr. Panaro

explains. Id. He "continue[s] to struggle with the emotional distress of [his] experiences on and after 9/11." Id. The Court finds that these are significant injuries and thus recommends a $5 million award.

**Milcia C. Pena**

Milcia C. Pena worked as a Front Desk Training Manager at the Marriott World Trade Center during the 9/11 Attacks. ECF No. 9663-12 ¶ 3. She was in her office near the first-floor lobby when the first plane hit. Id. ¶ 4. First responders told her to stay inside for her safety, so she did. Id. ¶ 5. When the second plane struck the South Tower, the first responders told her to evacuate, cover her head, and not look back. Id. ¶ 7. Nevertheless, Mrs. Pena witnessed a "horrific" scene outside of the hotel. Id. ¶ 8. She saw people jumping from the North and South towers and "crashing into the concrete" near her. Id.

She tried to run but struggled in her hotel uniform and high heels. Id. ¶ 9. The fleeing crowd trampled her and injured her lower back, left ankle, neck, left shoulder, and right leg. Id. As she got up, she tried to stumble to safety. Id. ¶ 10. But the South Tower collapsed and sent a plume of dust and debris into the air. Id. The "thick cloud of smoke, chemicals, and building debris" engulfed her, and she inhaled "large quantities" of the toxic substances. Id. The first responders told her to run north—she "did not stop running until [she] reached [her] mother's apartment in upper Manhattan." Id. ¶ 11.

Mrs. Pena's medical records confirm that she suffered injuries to her lower back, right leg, and left ankle injury, as well as a TMJ disorder, interstitial lung disease, chronic rhinosinusitis, migraines, GERD, and PTSD. Id. Ex. B. These are significant injuries. The Court therefore recommends an award of $5 million.

B.  **Burnett IX**, ECF No. 9873

**Jeremy Davids**

Jeremy Davids was on his way to a meeting at Three World Financial Center on September 11, 2001, when the first plane struck the North Tower. ECF No. 9875-2 ¶ 4. The advertising executive at Digitas, Inc. exited the Fulton Street subway station near the World Trade Center and saw smoke and fire emanating from the upper sections of the North Tower. Id. ¶¶ 3, 5. Paper was "fluttering in the air," and debris was "falling from the building." Id. ¶ 5. He continued walking towards the World Trade Center plaza and stood across the street from the two towers. Id.

Mr. Davids looked on in horror as people jumped from the towers. Id. ¶ 6. He heard another plane approaching, then saw the second plane strike the South Tower. Id. ¶ 7. A "burst of huge flames and debris" shot towards him. Id. As more debris started to fall around him, he held up his briefcase as protection. Id. He sought shelter beneath the overhanging roof of a nearby Century 21 store. Id. Eventually, as the debris deluge slowed, Mr. Davids walked to the end of the block and stood, watching, for "about 45 minutes." Id. ¶ 8.

Then, "a mass of people" began to run towards him. Id. ¶ 9. "[S]ensing their panic," Mr. Davids ran as well. Id. He "darted wildly down two small side streets," then noticed a "massive debris cloud barreling towards" him. Id. The cloud engulfed him and he "struggled to breath[e]." Id. He inhaled "large quantities" of debris and toxic dust into his lungs. Id. Stumbling through the thick dust, he found his way into a bar called the Blarney Stone, where he reports he was "coughing up soot." Id. ¶ 10. When it appeared as though the dust had cleared, he left the bar— "wading through piles of debris"—and took the subway back to his office. Id. ¶ 11.

The next day, Mr. Davids had "great difficulty breathing" and "intense" ear pain, so he sought medical treatment. Id. ¶ 12. His medical records show that he developed an upper respiratory disease, chronic cough syndrome, chronic laryngitis, chronic rhinitis, an ear infection, sinusitis, GERD, obstructive sleep apnea, and PTSD. Id. Ex. B. These are significant injuries, and the Court therefore recommends a $5 million award.

### C. Ortiz, ECF No. 9853

**Angel R. Ortiz**

On September 11, 2001, Angel R. Ortiz worked as a banquet waiter at the Marriott World Trade Center. ECF No. 9855-2 ¶ 4. He was preparing banquet tables in a third-floor ballroom when the first plane hit the North Tower. Id. Water from a pool located one floor above him started to leak down the walls, so Mr. Ortiz ran. Id. As he sprinted out of the hotel's back entrance, the second plane hit. Id.

Mr. Ortiz reached his vehicle, which was parked across the street. Id. But "he was not allowed to move it because human body parts were on top of it." Id. Instead, "he was told to run." Id. As he did, he saw people jumping from the towers to their deaths, and others "injured and bleeding around him." Id. The towers fell behind him. Id. As he ran, he was "engulfed in a cloud of debris." Id. His white uniform turned grey "from the soot." Id. He fell and injured his ankle. Id. And when he finally made it home, he was "so disoriented that he was still clutching the cutlery that he had been placing on the banquet tables." Id.

Mr. Ortiz's medical records confirm his injured ankle and a PTSD diagnosis. Id. Ex. B. He was prescribed medication to help him sleep and to cope with the effects of "agitation and intense flashbacks," as well as anxiety and depression. Id. The Court finds that these are significant injuries and thus recommends a $5 million award.

Mr. Ortiz died on May 19, 2012, "from issues unrelated to the injuries that he suffered on September 11, 2001." Pl.'s Mem. of Law 29, ECF No. 9854. Lisa Ortiz brings this claim as the personal representative of his estate.

### D. Burnett Non-Nationals II, ECF No. 9749

**Philipson Azenabor**

Philipson Azenabor worked as a security guard with Summit Security Services on the World Trade Center property. ECF No. 9751-2 ¶ 2. On September 11, 2001, he was working in the basement of the North Tower when the first plane hit the building. Id. ¶ 3. He felt the structure shake. Id. He rushed to the escalator to escape but fell and injured his right knee. Id. ¶ 4. He could "hear what sounded like bombs exploding above" him and "feared that [he] would die if the North Tower collapsed." Id.

He made his way outside, where he witnessed people jumping from the towers. Id. ¶ 5. As he stood in a "state of shock," the building began to collapse. Id. ¶ 6. He tried to run, but was "consumed" by a massive cloud of smoke, chemicals, and debris. Id. He inhaled these toxins into his system, "crawled" through the smoke and debris, and "limped" to safety. Id. ¶¶ 6, 7. He walked to 42nd Street, where he caught a bus home. Id. ¶ 6.

Mr. Azenabor suffered injuries that included a torn meniscus in his right knee (that required arthroscopic surgery to repair), as well as chronic rhinosinusitis and GERD. Id. ¶ 8. The medical records he provided confirm these injuries, which are significant. Id. Ex. B. Accordingly, the Court recommends a $5 million award.

**Felipe David**

On September 11, 2001, Felipe David was reviewing product inventory in the stock room of the North Tower basement. ECF No. 9751-3 ¶ 5. He worked as a vending machine operator

for Aramark. Id. ¶ 4. He suddenly felt the building shake and rumble. Id. ¶ 6. The ceiling above

him began to cave in. Id. He "immediately thought that the building could collapse," so he

moved towards the elevators. Id. But as he approached the elevators, the building "shook

violently." Id. Flames started to "swirl" on the ceiling. Id. Mr. David tried to cover his face, but

he was caught in the fire. Id. The flames "spread quickly" to his arms, burning his jacket and

sweater into pieces, and "covered" his face. Id. He tried to lie on the ground to put the fire out,

but it did not work. Id.

Burning alive, Mr. David ran out of the building. Id. ¶ 7. By the time he reached Barclay

Street, about six blocks away, his "skin was hanging off of [his] face and arms." Id. An

ambulance arrived. Id. ¶ 8. Paramedics cut open his pants and transported him to NYU Hospital.

Id. When he got there, the clothing on his upper body had mostly burned away. Id. He could

walk but "had no feeling in [his] face, arms, and hands due to [his] burn injuries." Id. The doctor

cut off his wedding ring to ease the pressure on his ring finger. Id. ¶ 9. He slipped into a coma

and only woke up six weeks later. Id.

When he awoke, Mr. David was in a different hospital. Id. ¶ 10. His wife was by his side.

Id. A few days later, his seven-year-old daughter came to visit; she cried when she saw him. Id.

Mr. David's injuries were devastating: burns covered 37% of his body, including his head, face,

arms, hands, and back. Id. ¶ 11. The majority were third-degree burns. Id. He spent 70 days in

the hospital being treated for his injuries and "endured multiple surgeries that included skin

grafting and painful debridement procedures." Id. While in the hospital, he also contracted

Klebsiella pneumonia, sepsis, and deep vein thrombosis. Pls.' Mem. of Law 19, ECF No. 9750

(citing ECF No. 9751-3 at 29).

For the next two years, Mr. David went through physical therapy to recover from his burn injuries. ECF No. 9751-3 ¶ 12. He has since undergone additional surgeries to both of his hands and his face, including several skin debridement procedures. Id. Decades later, he still suffers from significant scarring. Id. He has received continuous treatment for depression and PTSD. Id. His medical records confirm these devastating injuries. Id. Ex. C.

Mr. David's burns, six-week coma, months-long hospital stay, years-long physical therapy, and continuing care warrant a rare upward departure from the Court's standard $10 million award for devastating injuries. Cf. King Opinion, at *5; ECF No. 7323 at 39 (granting $10 million to other plaintiffs who sustained serious burns on 35% of their bodies, without these heightening factors). The Court therefore recommends awarding Mr. David $12 million in pain and suffering damages.

**Antonio Fernandez**

Antonio Fernandez had worked as a maintenance employee at the World Trade Center for more than ten years. ECF No. 9751-4 ¶ 3. On September 11, 2001, he was vacuuming a common area on the 35th floor of the South Tower when he heard a "huge explosion." Id. ¶ 4. Outside, he saw a "large hole" in the side of the North Tower. Id. "I began to panic and worry that I might be in extreme danger," he reports. Id. He rushed to the emergency stairwell, which grew more and more crowded at every floor. Id. ¶ 5. People began pushing and trying to run past one another to escape. Id. Mr. Fernandez fell, then was trampled by the crowd. Id. ¶ 6. He injured his lower back, left leg, left knee, and left ankle. Id. His coworker helped him to his feet, and he stumbled into the lobby. Id. ¶¶ 6, 7. He saw "injured people everywhere," and "everyone was crying and screaming." Id. ¶ 7. Outside, Mr. Fernandez was put into a taxi, which took him to Canal Street. Id. ¶¶ 8, 9. He met his wife there and got home. Id. ¶ 9.

Mr. Fernandez's injuries, however, continue to plague him. Id. ¶ 10. In the years since the 9/11 Attacks, he has continued to seek treatment for his physical and emotional injuries, which include a lumbar injury to his back, left knee derangement with a torn meniscus, left ankle derangement with a torn ligament, depression, and PTSD. Id. These are significant injuries confirmed by his medical records. Id. Ex. B. The Court thus recommends awarding him $5 million.

**Edgar Gutierrez**

Edgar Gutierrez worked as a catering supervisor for Lackman Culinary Services. ECF No. 9751-5 ¶ 3. On the morning of September 11, 2001, he was in the walk-in refrigerator on the 43rd floor of the South Tower when a colleague told him that there had been an explosion outside. Id. ¶ 4. Mr. Gutierrez left the walk-in and looked out of the window: he saw smoke and fire emanating from the North Tower, and debris falling down the side of the building. Id. Fearing that he "might be in extreme danger," he proceeded down the emergency stairwell. Id. ¶¶ 4, 5. Building security then informed him that the damage to the North Tower had not affected the South Tower, so he could return to work. Id. ¶ 5. He "ignored those instructions" and continued down the stairs. Id.

As he descended, he "heard a loud noise" above him. Id. ¶ 6. He later learned that it was the sound of United Airlines Flight 175 hitting the building. Id. People began to panic. Id. But Mr. Gutierrez reached the ground floor safely and exited the tower. Id. ¶ 7. Outside, he saw things that still "haunt" him to this day. Id. He saw "injured people everywhere," dead bodies and body parts, "people who had been severely burned," and people jumping to their deaths. Id. The South Tower then collapsed, engulfing Mr. Gutierrez in a cloud of "chemicals, toxins, and building dust." Id. ¶ 8. He "had to jump between cars to avoid the falling debris" and "severely

twisted [his] left knee." Id. He "struggled to breathe." Id. His medical reports confirm his injuries, including a torn meniscus in his left knee that later required surgery, GERD, obstructive airway disease, an upper respiratory disease, and PTSD. Id. Ex. C. The Court finds that these are significant injuries and therefore recommends a $5 million award.

**Jose Nivar**

Jose Nivar worked as a valet at the Marriott World Trade Center. ECF No. 9751-6 ¶ 3. While assisting hotel guests on the morning of September 11, 2001, he heard an explosion and felt the building shake. Id. ¶ 6. American Airlines Flight 11 had just hit the North Tower. Id. He "immediately began assisting hotel guests to escape from the entrance area of the hotel." Id. Then the second plane hit the South Tower. Id. ¶ 7. He continued to help hotel guests escape as people around him "began to panic and scream." Id.

As the South Tower began to collapse, Mr. Nivar ran. Id. ¶ 8. He saw "carnage and dead people" all around him. Id. A crowd of people "knocked [him] to the pavement and trampled over [him] as they rushed to escape," injuring his lower back and right knee. Id. As Mr. Nivar fled, he inhaled large quantities of dust and debris. Id. He walked all the way home to Queens. Id. ¶ 9.

Mr. Nivar's medical records confirm multiple injuries, including herniated discs in his lower back, internal derangement of his right knee, GERD, depression, and PTSD. Id. Ex. C. For these significant injuries, the Court recommends $5 million in pain and suffering damages.

**Manuela Pichardo**

On September 11, 2001, Manuela Pichardo was only a few weeks into her job as a maintenance employee at the World Trade Center. ECF No. 9751-7 ¶ 3. She was cleaning windows on the 81st floor of the South Tower when she saw a "fast-moving object flash by the

building." Id. ¶ 4. Then she heard a "huge explosion." Id. To her "horror," she saw a "large hole" in the side of the North Tower, with smoke billowing out. Id. She took the elevator down to the 78th floor, then entered the stairwell to escape the building. Id. ¶ 6. A security guard tried to stop her and send her back upstairs, but she "refused to comply." Id.

When she approached the 40th floor, Mrs. Pichardo felt the building shake and saw the walls begin to crack. Id. ¶ 7. She screamed. Id. She heard "glass exploding," and her ears began to ring "from the deafening explosions." Id. "It sounded like bombs were exploding in the stairwell," she reports. Id. People started to "jump over" her and she "had difficulty walking down the steps" due to over-crowding. Id. ¶¶ 7, 8. She fell backwards and slammed her head and lower back against the steps. Id. ¶ 8. Then, people "trampled" her, injuring her left foot. Id. In the hour and a half that she was walking down the stairs, she fell "several more times," further injuring her back and knees. Id.

As she escaped the South Tower, it began to collapse. Id. ¶ 10. She was "swallowed" by smoke. Id. Falling debris "slammed into [her] and slammed [her] into the concrete." Id. She inhaled the toxins and chemicals that surrounded her. Id. Finally, she fled across the Williamsburg Bridge. Id. ¶ 12. Her medical reports confirm that she suffered multiple injuries, including blunt head trauma with a cerebral concussion and post-concussion syndrome with cognitive dysfunction, cervical and lumbar injuries to her neck and back, an injury to her left foot, depression, and PTSD. Id. Ex. C. The Court recommends a $5 million award for these significant injuries.

**Miriam Rodriguez**

Miriam Rodriguez had worked as a housekeeper at the Marriott World Trade Center hotel for approximately 13 years when, on the morning of September 11, 2001, two highjacked planes

31

targeted her workplace. ECF No. 9751-8 ¶ 4. She was on the 4th floor when the first plane hit. Id. ¶ 6. She "immediately ran to the lobby area," as she had been instructed to do following the 1993 World Trade Center bombing. Id. First responders told her to evacuate the building. Id. ¶ 7. As she did, she saw that the North Tower was on fire. Id. She also watched in horror as people jumped from the upper floors of the building. Id. Then the second plane hit. Id. ¶ 8. She "became paralyzed with fear." Id. But a coworker "grabbed [her] and encouraged [her] to run from the area with him." Id.

Ms. Rodriguez followed others over a wall "to get away from the falling bodies and building debris." Id. ¶ 9. She jumped over the wall but landed awkwardly on her left leg. Id. She "collapsed to the ground in extreme pain." Id. Nevertheless, she got up, "[d]etermined to escape from the death and destruction" around her, and hailed a taxi to her mother's home in Manhattan. Id. ¶ 10. Her medical reports confirm her multiple injuries from that day, including a left ankle injury with torn ligaments, lumbosacral derangement in her spine, a left knee sprain, severe depression, and PTSD. Id. Ex. C. For these significant injuries, the Court recommends a $5 million award.

### Thelma Savery

On September 11, 2001, Thelma Savery worked as a cafeteria cashier for the Port Authority of New York and New Jersey at the World Trade Center site. ECF No. 9751-9 ¶ 4. She had held that position for approximately 14 years. Id. When the first plane struck the North Tower, Ms. Savery was working in the Port Authority cafeteria on the 44th floor of that building. Id. ¶ 6. She felt the tower shake and "immediately thought that the building could collapse." Id. She rushed to the emergency stairwell, where she found a crowd of other people running down the stairs to escape. Id. ¶ 7. At every floor, more people entered the stairwell. Id. ¶ 8. By the 26th

floor, a group "trampled" Ms. Savery—forcing her to the ground and injuring her back. Id. A coworker helped her up. Id. ¶ 9.

When she exited the stairwell at the 3rd floor Mezzanine, she entered a "horrific" scene. Id. She "saw body parts all over the floor and blood splattered on the walls." Id. As she stepped outside, she "realized that the South Tower had collapsed." Id. ¶ 10. More "dismembered" bodies littered the street around her. Id. Another crowd knocked her to the ground and trampled her. Id. She managed to leave the area before the North Tower collapsed, then walked for eight hours until she got home. Id. ¶¶ 11, 12. Her medical records demonstrate that she suffered a herniated disc in her lower back and underwent two back surgeries. Id. Ex. C. She also received continued treatment for depression and PTSD. Id. The Court finds that these are significant injuries and therefore recommends a $5 million award.

**Yuni Vasquez**

Yuni Vasquez had worked at the World Trade Center for only one week when the 9/11 Attacks occurred. ECF No. 9751-10 ¶ 3. He was a maintenance employee with American Building Maintenance. Id. On September 11, 2001, Mr. Vasquez was cleaning the windows on the 81st floor of the South Tower when the first plane hit the North Tower. Id. ¶ 4. He heard a "huge explosion," turned, and saw "flames shooting out of the upper section of the North Tower and papers flying everywhere around the building." Id. He ran towards the emergency exit stairwell. Id. ¶ 5.

Mr. Vasquez was "surprised" to discover that the stairwell was relatively empty and that the lights remained on. Id. ¶ 5. That soon changed: as he descended the steps, the lights went out and "hundreds of people packed into the stairwell." Id. ¶ 6. People began to panic. Id. Suddenly, the crowd pushed Mr. Vasquez from behind, sending his face and chest crashing into the

concrete steps. Id. ¶ 7. People trampled him as he lay face down in the stairwell. Id. He struggled

to stand, but someone helped him to his feet. Id. ¶ 8. Mr. Vasquez then "limped" down the stairs,

clutching the handrail—but he was again shoved to the floor. Id. His head and body "slammed

against the concrete" once more. Id.

On October hour later, Mr. Vasquez finally made it out of the tower. Id. ¶ 9. A firefighter helped

him exit the building. Id. Outside, he "limp[ed] around dead bodies and body parts as [he]

attempted to escape" the area. Id. ¶ 10. He managed to catch a bus northbound, which dropped

him at 125th Street. Id. He made it home around 4:30 p.m. Id. His medical reports confirm his

injuries, including back injuries with herniated and bulging discs, blunt head trauma with a

cerebral concussion, cognitive dysfunction and headaches, bilateral shoulder, knee, and ankle

injuries, a neck injury, a chest injury, as well as TMJ, depression, and PTSD. Id. Ex. C. The

Court finds these to be significant injuries and therefore recommends a $5 million award.

### E. **Burnett Non-Nationals III**, ECF No. 9889

### Ivan Almendarez, Jr.

On September 11, 2001, Ivan Almendarez, Jr. was in the basement of the North Tower

collecting cleaning supplies when the first plane hit. ECF No. 9891-2 ¶ 4. He worked as a janitor

for American Building Maintenance ("ABM"), a position he had held for more than eight years.

Id. ¶ 3. He felt the building shake and heard several explosions. Id. ¶ 4. He grabbed his radio and

rushed to escape. Id. ¶ 5. As he did, he came across another man who worked in the building,

whose arms and face had been "severely burned due to a fireball which exploded out of the

basement elevator." Id. He helped the injured man as they both fled through the North Tower's

loading dock. Id. When Mr. Almendarez, Jr. jumped from the loading dock onto the ground

level, however, he fell and injured his left knee. Id.

Over the radio, ABM management instructed all staff to rendezvous nearby and await further instructions. Id. ¶ 6. Mr. Almendarez, Jr. made it to the meet-up point; he and his coworkers waited for about 40 minutes. Id. ¶ 7. Then, he saw the second plane crash into the South Tower. Id. As "the carnage unfold[ed]" in front of him, he "heard a loud sound similar to thunder" and "watched as the building beg[a]n to collapse." Id. ¶ 8. The debris surrounded him. Id. He ran, but he could not see due to the "thickness of the debris cloud." Id. ¶ 9. He tripped and fell, and people "trampled over [him] as they fled the area." Id. He further injured his back and right shoulder. Id. Eventually, he made his way to his union headquarters on Canal Street. Id. ¶ 12. A union representative helped him into a bathroom, where Mr. Almendarez, Jr. was able to clean off the dust and debris that covered his entire body. Id. From there, he walked home, where he "collapsed due to [his] injuries and [his] exhaustion." Id. ¶ 13. His family helped him shower and get to bed. Id.

His medical records confirm that Mr. Almendarez, Jr. suffered multiple injuries, including a cervical disc disorder, a sprained left knee, a sprained right shoulder joint, and PTSD. Id. Ex. C. The Court finds that these are significant injuries and therefore recommends a $5 million award.

**Robert Ramos**

At the time of the 9/11 Attacks, Robert Ramos worked as a painter for DeFila Painting. ECF No. 9891-3 ¶ 3. That morning, he was painting the interior of a building located at 88 Greenwich Street—near the World Trade Center—when he witnessed the second plane strike the South Tower. Id. ¶ 4. He was so close to the tower that "the impact knocked [him] off his feet." Id. He saw a "large fire ball rise out of the South Tower" and then watched as "human bodies began to fall from the building right before [his] eyes." Id. "Paralyzed with fear," Mr. Ramos

"stood in awe of the carnage" until he saw the South Tower begin to collapse. Id. ¶ 5. He sprinted out of the building and into the Battery Tunnel, seeking refuge from the dust and debris that was enveloping the area. Id. But he "soon discovered that [he] was trapped in an enclosed area that was quickly filling with smoke, dust, and debris." Id.

He "struggled to breathe" in the tunnel as he continued to inhale the toxic dust and debris. Id. ¶ 6. He moved towards the Brooklyn end of the tunnel, where he collapsed. Id. An ambulance crew found him and brought him to Long Island College Hospital. Id. ¶ 7. For the rest of 2001, he reports, he continued to struggle with his breathing—he even "became excessively fatigued doing simple physical tasks, such as walking up stairs." Id. ¶ 8. His medical reports explain that these symptoms resulted from the multiple injuries and conditions he suffered as a result of the 9/11 Attacks, including asthma, chronic rhinosinusitis, reactive airway disease syndrome ("RADS"), upper airway hyperreactivity, GERD, and PTSD. Id. Ex. C. The Court finds these to be significant injuries and thus recommends a $5 million award.

## CONCLUSION

The Court recommends granting the motion filed by Mr. Ortiz. See ECF No. 9853. The Court recommends granting the motions filed by the Burnett Plaintiffs, subject to the reduction in damages recommended for Mr. Ciarnella. See ECF Nos. 9660, 9749, 9873, 9889. The Court recommends denying without prejudice the Ashton Plaintiff's motion. See ECF No. 9879.

The Court further recommends granting pain and suffering damages as detailed in the attached Exhibits A and B. The listed Plaintiffs should also be awarded prejudgment interest at a rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment.

These Plaintiffs should be permitted to submit additional applications for damages, including punitive damages, consistent with any future rulings of the Court.

SARAH NETBURN
United States Magistrate Judge

DATED:    February 19, 2025
          New York, New York

\*            \*            \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable George B. Daniels if required by that judge's Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Daniels. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).

# Exhibit A

EXHIBIT A

U.S. National Personal Injury

| | Personal Representative | | | | Claimant | | | | | | Claim Information | | | Pain & Suffering Damages | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | First | Middle | Last | Suffix | First | Middle | Last | Suffix | Nationality on 9/11 | 9/11 Site | Case | Complaint | Amendments & Substitutions | Documentation | Prior Award | Amount | Treble |
| 1 | | | | | Scott | Roy | Beloten | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 3692 | | | | $7,000,000 | |
| 2 | | | | | Maria | E. | Castillo | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 3790 | | | | $5,000,000 | |
| 3 | | | | | Anthony | | Ciarnella | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 3801 | | | | $5,000,000 | |
| 4 | | | | | John | | Cretella | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 3845 | | | | $5,000,000 | |
| 5 | | | | | James | J. | Csorny | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 3852 | | | | $5,000,000 | |
| 6 | | | | | Hipolito | | D'Oleo | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 3923 | | | | $5,000,000 | |
| 7 | | | | | Barbara | Ellen | Einzig | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 3958 | | | | $5,000,000 | |
| 8 | | | | | Fausto | Antonio | Gomez | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 4063 | | | | $5,000,000 | |
| 9 | | | | | Thomas | Joseph | Grogan | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 4084 | | | | $5,000,000 | |
| 10 | | | | | Vincent | J. | Panaro | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 4548 | | | | $5,000,000 | |
| 11 | | | | | Milcia | C. | Pena | | U.S. | NY | Burnett VIII | 1:15-cv-09903, 53, at 4567 | | | | $5,000,000 | |
| 12 | | | | | Jeremy | Brandon | Davids | | U.S. | NY | Burnett IX | 1:15-cv-09903, 53, at 3869 | | | | $5,000,000 | |
| 13 | Lisa | | Ortiz | | Angel | R. | Ortiz | | U.S. | NY | Ortiz | 1:22-cv-03100, 1, at 1 | | | | $5,000,000 | |

# Exhibit B

**EXHIBIT B**

**Non-U.S. National Personal Injury**

| First | Middle | Last | Suffix | Nationality on 9/11 | 9/11 Site | Case | Complaint | Amendments & Substitutions | Documentation | Prior Award | Amount | Treble |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Philipson | | Azenabor | | Nigeria | NY | Burnett Non-Nationals II | 1:15-cv-09903, 53, at 3661 | | | | $5,000,000 | |
| Felipe | | David | | Honduras | NY | Burnett Non-Nationals II | 1:15-cv-09903, 53, at 3868 | | | | $12,000,000 | |
| Antonio | Narcisco | Fernandez | | Dominican Republic | NY | Burnett Non-Nationals II | 1:15-cv-09903, 53, at 3985 | | | | $5,000,000 | |
| Edgar | | Gutierrez | | Columbia | NY | Burnett Non-Nationals II | 1:15-cv-09903, 53, at 4098 | | | | $5,000,000 | |
| Jose | | Nivar | | Dominican Republic | NY | Burnett Non-Nationals II | 1:15-cv-09903, 53, at 4511 | | | | $5,000,000 | |
| Manuela | | Pichardo | | Dominican Republic | NY | Burnett Non-Nationals II | 1:15-cv-09903, 53, at 4581 | | | | $5,000,000 | |
| Miriam | | Rodriguez | | Dominican Republic | NY | Burnett Non-Nationals II | 1:15-cv-09903, 53, at 4670 | | | | $5,000,000 | |
| Thelma | | Savery | | Belize | NY | Burnett Non-Nationals II | 1:15-cv-09903, 53, at 4716 | | | | $5,000,000 | |
| Yuni | | Vasquez | | Dominican Republic | NY | Burnett Non-Nationals II | 1:15-cv-09903, 53, at 4874 | | | | $5,000,000 | |
| Ivan | | Almendarez | Jr. | Dominican Republic | NY | Burnett Non-Nationals III | 1:15-cv-09903, 53, at 3639 | | | | $5,000,000 | |
| Robert | | Ramos | | Nicaragua | NY | Burnett Non-Nationals III | 1:15-cv-09903, 53, at 4622 | | | | $5,000,000 | |